# Exhibit 1

**EFiled:  Dec 15 2022 11:01AM EST**
**Transaction ID 68618571**
**Case No. 2022-1158-**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| NEXII BUILDING SOLUTIONS INC., a Canadian corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) C.A. No. _____ |
| NEXUS 1, LLC, a Delaware limited liability company; NexUS Manager, LLC, a Delaware limited liability company; John Wolfington; and Daniel Metzler; | ) ) ) ) ) ) |
| Defendants. | ) ) |

## VERIFIED COMPLAINT

Plaintiff Nexii Building Solutions Inc. ("Nexii") brings the following Verified Complaint (the "Complaint") against Defendants NexUS 1, LLC (the "Hazleton Operator"), NexUS Manager, LLC (the "Wolfington Manager"), John Wolfington ("Wolfington"), and Daniel Metzler ("Metzler" and, together with the Wolfington Manager and Wolfington, the "WM Defendants") (collectively, the Hazleton Operator and the WM Defendants, the "Defendants"), and respectfully alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     Nexii is a green construction technology company that designs and manufactures high-performance green buildings and retrofit products using a state-

of-the-art process and proprietary material, Nexiite, invented by Nexii. Nexii is a Canadian company based in Vancouver, British Columbia with Nexii certified manufacturing plants located in Canada and the United States.

2.     The Hazleton Operator is a Delaware limited liability company with operations based in Hazleton, Pennsylvania. Nexii has no membership interests in the Hazleton Operator and has no affiliation with the Hazleton Operator other than through the agreements described herein.

3.     The Hazleton Operator's manager was the Wolfington Manager, an entity controlled and indirectly owned by Wolfington and Metzler. On or about September 8, 2022, the Hazleton Operator's authorized members terminated the Wolfington Manager pursuant to the applicable operating agreement. The WM Defendants refuse to acknowledge their termination, however, and remain in *de facto* control of the Hazleton Operator.

4.     Effective October 7, 2020, Nexii and the Hazleton Operator entered into that certain Amended and Restated Nexii Certified Manufacturing Agreement, as amended (the "Manufacturing Agreement")[1] granting the Hazleton Operator the right and license to operate and manage a Nexii production facility in Hazleton,

---

[1] A true and correct copy of the Manufacturing Agreement is attached hereto as Exhibit A. Due to the voluminous nature, the schedules and exhibits thereto have not been included.

Pennsylvania (the "Hazleton Facility"). Pursuant to the Manufacturing Agreement, Nexii authorized the Hazleton Operator to manufacture, sell, and install Nexii's building components and systems using Nexii's proprietary methods and materials (the "Nexii System").

5.      Under the terms of the Manufacturing Agreement, upon the occurrence of certain defaults by the Hazleton Operator, Nexii is permitted to "[s]tep-in, manage, supervise and assist" the Hazleton Operator in operating the Hazleton Facility, including by manufacturing Nexii components and fulfilling customer orders. The Manufacturing Agreement specifically provides that Nexii shall have "unfettered access and use" of the Hazleton Facility during the exercise of Nexii's step-in rights.

6.      As described in more detail below, because of the Hazleton Operator's ongoing defaults under the Manufacturing Agreement and increasingly troubling behavior by Wolfington and Metzler in their operation of the Hazleton Facility and otherwise, on December 14, 2022, Nexii invoked its rights to step-in and manage the Hazleton Facility. The Defendants did not agree to grant Nexii immediate access to the Hazleton Facility, thereby forcing Nexii to file this action seeking equitable injunctive relief.

## THE PARTIES

7.      Plaintiff Nexii is a Canadian company incorporated under the laws of British Columbia with its principal office located in Vancouver, British Columbia, Canada. Nexii's buildings and components are manufactured and sold in Canada and the United States.

8.      On information and belief, the Hazleton Operator is and at all relevant times was, a Delaware limited liability company organized under the laws of Delaware with its principal office located in King of Prussia, Montgomery County, Pennsylvania.

9.      On information and belief, the Wolfington Manager is and at all relevant times was, a Delaware limited liability company organized under the laws of Delaware with its principal office located in King of Prussia, Montgomery County, Pennsylvania.

10.     On information and belief, Wolfington is a resident of the Commonwealth of Pennsylvania, Montgomery County.

11.     On information and belief, Metzler is a resident of the Commonwealth of Pennsylvania, Montgomery County.

## JURISDICTION AND VENUE

12.     As Delaware companies, this Court has personal jurisdiction over the Hazleton Operator and Wolfington Manager.

4

13.    All acts alleged herein by Wolfington and Metzler were undertaken in their capacities as members, managers, and/or agents, directly or indirectly, of the Wolfington Manager and/or the Hazleton Operator and/or with the intention to act on behalf of such entities. Therefore, Wolfington and Metzler are subject to this Court's jurisdiction pursuant to 6 *Del. C.* § 18-109(a)

14.    The resolution of Nexii's claims against Wolfington and Metzler, which claims are all predicated on their acts on behalf of or with respect to the Hazleton Operator and the Wolfington Manager, are inextricably bound up in Delaware law and Delaware has a strong interest in providing a forum for addressing Wolfington's and Metzler's failure to properly discharge their respective managerial functions. Thus, Wolfington and Metzler are subject to this Court's jurisdiction pursuant to 10 *Del. C.* § 3104(c)(4).

15.    The Manufacturing Agreement is governed by Delaware law and expressly provides that equitable relief may be sought in the courts. Here, Nexii is seeking equitable relief against Defendants to obtain a temporary restraining order, preliminary and permanent injunctions, and specific performance of the Hazleton Operator's obligations under the Manufacturing Agreement. Therefore, venue is proper in this Court pursuant to 10 *Del. C.* § 341.

## GENERAL ALLEGATIONS

**I.    The Parties' Agreements and the Hazleton Operator's Payment Defaults.**

### The Manufacturing Agreement

16.    On or about October 7, 2020, Nexii and the Hazleton Operator entered into that certain Nexii Certified Manufacturer Agreement (the "Original Manufacturing Agreement").

17.    On or about September 3, 2021, Nexii and the Hazleton Operator agreed to amend and restate the Original Manufacturing Agreement and executed the Manufacturing Agreement, which Manufacturing Agreement was amended from time to time thereafter.

18.    Pursuant to the Manufacturing Agreement, the Hazleton Operator operated the Hazleton Facility, manufacturing panels and other products utilizing the Nexii System.

19.    Wolfington and Metzler have acted as the individual managers of the Hazleton Facility operations since the Manufacturing Agreement's effective date of October 7, 2020.

20.    Under Section 17.3, the Manufacturing Agreement defines remediation defaults as including, among other things, the Hazleton Operator's default or failure to perform any of its obligations under any agreement between Nexii and the Hazleton Operator pursuant to which Nexii is granted a security interest.

6

21.     Under Section 22.1 of the Manufacturing Agreement, Nexii and the Hazleton Operator acknowledge that failure to comply with the Manufacturing Agreement could cause the other party irreparable harm and that each party is entitled to equitable relief from a court of competent jurisdiction.

22.     Section 22.1 of the Manufacturing Agreement further provides that to the extent a party is successful in obtaining equitable relief, such party is entitled to damages incurred as a result of the other party's breach, plus attorneys' fees, client costs, and expenses incurred by the party attempting to enforce the Manufacturing Agreement.

The Promissory Note and Security Agreement

23.     The Manufacturing Agreement requires the Hazleton Operator to pay Nexii a contract fee of $5,000,000 (the "Contract Fee") in exchange for Nexii granting the Hazleton Operator the right and license to establish and operate the Hazleton Facility.

24.     In December 2020, after executing the Original Manufacturing Agreement, the Hazleton Operator paid $250,000 of the Contract Fee.

25.     On March 8, 2022, Nexii and the Hazleton Operator executed an amendment to the Manufacturing Agreement (the "Contract Fee Amendment") pursuant to which the Hazleton Operator agreed to pay Nexii the remaining Contract

Fee, subject to the terms set forth in the promissory note executed simultaneously therewith.[2]

26.     On March 8, 2022, consistent with the Contract Fee Amendment, the Hazleton Operator executed a promissory note for $4,750,000 in favor of Nexii (the "Promissory Note").[3]

27.     The Promissory Note includes the following payment terms:  (a) the sum of $2,500,000, plus interest of 12.5%, would be payable in twenty-four (24) monthly payments of $119,500.23 commencing June 1, 2022; and (b) the sum of $2,250,000, plus interest of 6%, would be payable in twenty-four (24) monthly payments of $99,721.37 commencing June 1, 2022.

28.     On March 8, 2022, Nexii and the Hazleton Operator executed a Security Agreement securing the Hazleton Operator's obligations under the Promissory Note.[4]

29.     Pursuant to Section 2 of the Security Agreement, the Hazleton Operator granted Nexii a security interest in all of the Hazleton Operator's rights, title, and interest in and to the following assets: (a) accounts; (b) chattel paper; (c) deposit

---

[2] A true and correct copy of the Contract Fee Amendment is attached hereto as Exhibit B.

[3] A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

[4] A true and correct copy of the Security Agreement is attached hereto as Exhibit D.

accounts; (d) documents; (e) equipment; (f) general intangibles; (g) instruments; (f) inventory; (i) investment property; and (k) letter of credit rights (collectively, the "Collateral").

30.     On March 8, 2022, Nexii perfected its interest in the Collateral by filing a UCC Financing Statement with the Delaware Secretary of State.

31.     Under Section 18 of the Security Agreement, an event of default occurs when the Hazleton Operator fails to (a) timely pay its obligations under the Promissory Note, or (b) perform under any other agreement with Nexii.

<u>The Master Lease Agreement</u>

32.     On March 8, 2022, Nexii and the Hazleton Operator entered into that certain Master Lease Agreement pursuant to which Nexii leased certain equipment to the Hazleton Operator necessary for the operation of the Hazleton Facility in exchange for rent payable as follows: (a) a one-time payment on June 1, 2022 in the amount of $212,156.99, and (b) monthly payments beginning June 1, 2022, and continuing for 119 months, initially in the amount of $67,247.99, plus interest.[5]

33.     Under Section 11 of the Master Lease Agreement, failure to pay rent within ten (10) days of its due date constitutes an event of default.

---

[5] A true and correct copy of the Master Lease Agreement is attached hereto as <u>Exhibit E</u>.

Defaults Under the Various Agreements

34.     As of the date of this Complaint, the Hazleton Operator has not made any payments under the Promissory Note and is in default of its obligations thereunder.

35.     As of the date of this Complaint, the Hazleton Operator has not made any payments under the Master Lease Agreement and is in default of its obligations thereunder.

36.     The Hazleton Operator's defaults under the Promissory Note and Master Lease Agreement also constitute events of default under the Security Agreement.

37.     Under Section 17.3 of the Manufacturing Agreement, remediation defaults occur when the Hazleton Operator defaults or fails to perform any of its obligations under the Security Agreement.

38.     The Hazleton Operator's defaults under the Security Agreement constitute a remediation default under the Manufacturing Agreement.

39.     On information and belief, as the managers of the Hazleton Facility's operations, the WM Defendants direct and authorize payment of the Hazleton Operator's financial obligations.

40.     On information and belief, the WM Defendants prevented the Hazleton Operator from paying its obligations under the Promissory Note and Master Lease

10

Agreement, thereby causing the Hazleton Operator to default under the Promissory Note, Security Agreement, Master Lease Agreement, and Manufacturing Agreement (collectively, the "Nexii Agreements").

Step-In Rights Upon a Default

41.    Under Section 17.5 of the Manufacturing Agreement, upon the occurrence and during the continuance of a remediation default, Nexii may elect to "[s]tep-in, manage, supervise and assist" the Hazleton Operator in operating the Hazleton Facility, including fulfilling contracts and manufacturing panels and other products utilizing the Nexii System (the "Step-In Rights").[6]

42.    To the extent Nexii exercises its Step-In Rights, the Hazleton Operator is required to give Nexii unfettered access and use of the Hazleton Operator's manufacturing facilities, casting beds, workforce, proprietary information, equipment, materials, parts and other supplies and resources located at the Hazleton Facility.

43.    The Manufacturing Agreement has always included the Step-In Rights though they have been refined through certain amendments, particularly the Fourth Amendment to the Manufacturing Agreement. Nexii required the Step-In Rights so

---

[6] A true and correct copy of the Fourth Amendment to the Manufacturing Agreement pursuant to which Section 17.5 of the Manufacturing Agreement was amended is attached hereto as Exhibit F.

11

that in the event of a remediation default, Nexii can step-in, supervise, and manage operations at the Hazleton Facility to protect Nexii's reputation and goodwill in the industry by ensuring the quality of work being done utilizing the Nexii System and that client contracts are timely and properly fulfilled.

44.     In light of the Hazleton Operator's defaults under the Manufacturing Agreement, and the circumstances detailed in Sections III and IV below,   on December 14, 2022, Nexii advised Defendants that Nexii intended to immediately exercise its Step-In Rights.

45.     Notwithstanding the Hazleton Operator's obligation to cooperate with Nexii during the enforcement of its Step-In Rights, Defendants did not agree to grant Nexii immediate access to the Hazleton Facility, thereby preventing Nexii from exercising its Step-In Rights.

46.     As a result of the Hazleton Operator's payment defaults and other breaches of the Manufacturing Agreement described herein, and the WM Defendants' interference with the Nexii Agreements, Nexii has experienced pecuniary losses and will experience irreparable harm if not permitted to exercise its Step-In Rights.

47.     In particular, and as detailed in Paragraphs 109-119 below, by obstructing Nexii's exercise of its Step-In Rights, the Hazleton Operator is

jeopardizing key customer relationships – an outcome the Step-In Rights are specifically designed to prevent.

## II. The WM Defendants' Authority to Manage the Hazleton Operator is Terminated.

### The Hazleton Operator and Related Operating Agreements

48. On or about September 1, 2021, the Hazleton Operator's manager and members executed the Second Amended and Restated Operating Agreement of NexUS 1, LLC (the "Hazleton Operating Agreement").[7]

49. On information and belief, the Hazleton Operator's membership interests are held as follows: (a) Hazleton OZF, LLC, 43%; (b) the Wolfington Manager, 38%; (c) Fernwood, LLC, 2%; (d) Six S. Investments, LLC, 10%; (e) Solidity Consulting Solutions, LLC, 2%; and (f) MMT Master Investment, LLC, 5%.

50. Pursuant to Section 7.01(a) of the Hazleton Operating Agreement, the Hazleton Operator shall be managed, and the conduct of its business shall be controlled, by NexUS Development, LLC (the "Hazleton Manager").

---

[7] A true and correct copy of the Hazleton Operating Agreement is attached hereto as Exhibit G.

51.     On or about September 1, 2021, the Hazleton Manager's managers and members executed the Amended and Restated Operating Agreement of NexUS Development, LLC (the "Manager's Operating Agreement").[8]

52.     On information and belief the Hazleton Manager's membership interests are held as follows: (a) Diamond Head, LLC ("Diamond Head") 50%; (b) the Wolfington Manager, 45%; and (c) MMT Master Investment, LLC, 5%.

53.     Pursuant to Section 7.01(a) of the Manager's Operating Agreement, the Hazleton Manager shall be managed, and the conduct of its business controlled, by: (a) the Wolfington Manager; and (b) Diamond Head.

54.     On information and belief, the Wolfington Manager is owned equally by entities owned and/or controlled by Wolfington and entities owned and/or controlled by Metzler.

55.     On information and belief, Diamond Head is owned and/or controlled, either directly or indirectly, by David Hamamoto ("Hamamoto") and Keith Feldman ("Feldman").

56.     Section 7.01(a) of the Manager's Operating Agreement provides that the Wolfington Manager shall be authorized to act on behalf of the Hazleton

---

[8] A true and correct copy of the Manager's Operating Agreement is attached hereto as Exhibit H.

Manager with respect to its day-to-day operational activity, including in the Hazleton Manager's role as manager of the Hazleton Operator.

57.    Section 7.01(a) of the Manager's Operating Agreement further provides that to the extent any action is not clearly a day-to-day operational activity of the Hazleton Manager or the Hazleton Operator, the Wolfington Manager shall obtain the consent of Diamond Head.

58.    Section 7.07(a) of the Manager's Operating Agreement provides that Diamond Head may remove the Wolfington Manager in Diamond Head's reasonable discretion if the Wolfington Manager has committed gross negligence, fraud, defalcation, willful misconduct, material misrepresentation, or a material breach of any of the Wolfington Manager's obligations to any lender of either the Hazleton Manager or the Hazleton Operator, or to Diamond Head.

59.    Section 7.01(a) of the Manager's Operating Agreement provides that any removal pursuant to such provision shall be effective immediately.

<u>The WM Defendants are Removed as Managers</u>

60.    On or about September 8, 2022, Diamond Head issued a notice of removal of the Wolfington Manager pursuant to Section 7.07(a) of the Manager's Operating Agreement due to the Wolfington Manager's gross negligence, material

misrepresentations, and breaches of certain loan agreements (the "Notice of Removal").[9]

61.    The Notice of Removal stated that the removal was effective immediately.

62.    Notwithstanding the Notice of Removal, the Wolfington Manager, through Wolfington and Metzler, remained in *de facto* control of the Hazleton Operator.

63.    On or about September 14, 2022, Diamond Head, in its capacity as duly appointed manager of the Hazleton Operator, through counsel, advised the law firm Silverang Rosenzwieg & Haltzman, LLC ("SR&H") that it was terminating any professional relationship between the Hazleton Operator and SR&H, effective immediately (the "Termination Letter").[10]

64.    SR&H has purported to represent, among others, the Hazleton Operator, the WM Defendants, and certain other related entities and trusts.

65.    Notwithstanding the Termination Letter, on information and belief, SR&H continues to hold itself out as counsel to each of Defendants, including the Hazleton Operator.

---

[9] A true and correct copy of the Notice of Removal is attached hereto as Exhibit I.

[10] A true and correct copy of the Termination Letter is attached hereto as Exhibit J.

66.     On information and belief, as of the date of this Complaint, Diamond Head, Hamamoto, and Feldman each view the Wolfington Manager as having been removed as manager of the Hazleton Operator in accordance with the Notice of Removal and the Manager's Operating Agreement, and do not recognize SR&H as counsel to the Hazleton Operator.

67.     Accordingly, none of the WM Defendants have any authority, directly or indirectly, to act on behalf of the Hazleton Operator.

68.     Likewise, SR&H does not have authority to represent the Hazleton Operator in this or any other proceeding or capacity.

The Purported Notice of Default

69.     On December 6, 2022, Nexii received a document purporting to be a notice of default issued to Nexii by the Hazleton Operator (the "Purported Notice of Default").

70.     The Purported Notice of Default demands payment of damages and relies entirely on false and inaccurate allegations to support an alleged default by Nexii under the Manufacturing Agreement.

71.     Without acknowledging the WM Defendants' authority to issue the Purported Notice of Default, Nexii intends to respond to the Purported Notice of Default and the allegations contained therein in accordance with the mediation and arbitration procedures set forth in Article 23 of the Manufacturing Agreement.

17

72.     The Purported Notice of Default was sent by SR&H, purportedly on behalf of the Hazleton Operator, notwithstanding that Diamond Head terminated SR&H's authority to act on behalf of the Hazleton Operator last September.

73.     On information and belief, Diamond Head did not authorize issuance of the Purported Notice of Default, and Diamond Head views the Notice of Removal as having been effective. Accordingly, none of the WM Defendants nor SR&H are authorized to act on behalf of the Hazleton Operator.

74.     The Purported Notice of Default and its issuance do not in any way limit or restrict Nexii's right to exercise its Step-In Rights.

75.     The Purported Notice of Default is just one example of the WM Defendant's erratic and reckless behavior, which threatens the viability of the Hazleton Operator and its ability to operate, as outlined in greater detail in Section IV below.

76.     Nexii's exercise of its Step-In Rights is crucial to ensuring the viability of the Hazleton Operator's business and to preserving Nexii's brand and image. Allowing the WM Defendants' misconduct to continue risks permanent damage to both the Hazleton Operator and Nexii.

**III.    Defendants Shut Nexii Out of the Hazleton Facility and Misappropriate Nexii's Confidential Information, and the Hazleton Operator Violates Non-Competition Covenants.**

77.    Given the highly proprietary nature of the Nexii System, Article 10 of the Manufacturing Agreement contains extensive confidentiality provisions, defining "Confidential Information" broadly to include, among other things, any and all non-public or proprietary information relating to the operation of the Hazleton Facility, Nexii's business, the Nexii System and the materials utilized in such system.

78.    While Nexii does not disclose the formula for its proprietary Nexiite product to certified manufacturers like the Hazleton Operator, it does disclose substantial Confidential Information to certified manufacturers regarding the Nexii System, which includes Nexii's unique building techniques and business model.

79.    Nexii is not the only modular building company on the market. Therefore, maintaining the secrecy of its methods and processes is crucial to staying competitive in the market.

80.    Under Section 10.3 of the Manufacturing Agreement, as a condition of the rights granted thereunder, the Hazleton Operator agrees to, among other things: (a) not disclose any Confidential Information; (b) not use, copy, or exploit any Confidential Information except for operating the business under the Manufacturing

Agreement; (c) not reverse engineer the Confidential Information; and (d) take all reasonably necessary steps protect the Confidential Information.

81.     Section 10.2 of the Manufacturing Agreement provides that any breach of the Hazleton Operator's obligations under Article 10 of the Manufacturing Agreement constitutes a remediation default.

82.     Under Section 15.1 of the Manufacturing Agreement, the Hazleton Operator expressly covenants and agrees that it will not directly or indirectly, for itself, or through, on behalf, or in conjunction with any person: (a) divert or attempt to divert any business or customer of the business, Nexii, or any other certified manufacturer of the Nexii System to any competitor of the Nexii by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is injurious or prejudicial to the trademarks associated with the Nexii System or the Nexii System itself; or (b) own, maintain, operate, engage in, be concerned with, or have any other interest in, in whatever capacity, any business that either (i) competes with the business of Nexii or (ii) is engaged in the sale of modular building components or the sale of products and services ancillary thereto.

83.     Pursuant to Section 15.5 of the Manufacturing Agreement, the Hazleton Operator agrees that all restrictions contained in Article 15 are reasonable and valid and all defenses to Nexii's strict enforcement thereof are waived.

84.    Under Section 17.3 of the Manufacturing Agreement, remediation defaults are defined to include, among other things, the Hazleton Operator's failure to comply with any of the covenants contained in Article 15, and the Hazleton Operator's disclosure of any Confidential Information contrary to the terms of Section 10.1 of the Manufacturing Agreement.

85.    On information and belief, the WM Defendants advised Feldman, one of the Diamond Head partners, that they intend to engage in a competing business manufacturing modular building panels at the Hazleton Facility notwithstanding the Hazleton Operator's agreement to utilize the Halzeton Facility solely as a Nexii manufacturing facility pursuant to Section 8.5 of the Manufacturing Agreement.

86.    On or about November 29, 2022, Metzler messaged Nexii's executive vice president of manufacturing, Brian Carter ("Carter") advising him that Defendants would communicate only with Sidwell, that no employees of the Hazleton Operator would be attending any meetings with Nexii, and insisting that Nexii refrain from communicating with anyone at the Hazleton Facility.

87.    On information and belief, on or about November 29, 2022, the WM Defendants instructed the Hazleton Operator's employees not to attend any meetings with Nexii going forward.

88.    Since November 29, 2022, the WM Defendants have barred Nexii employees from entering the Hazleton Facility.

89.    Prior to November 29, 2022, Nexii employees enjoyed close and productive working relationships with the Hazleton Operator employees and frequently attended in-person meetings together. Indeed, Nexii usually had one or more employees working at the Hazleton Facility with the Hazleton Operator at least three out of every four weeks to assist and supervise operations at the Hazleton Facility.

90.    Carter has spent considerable time working with the Hazleton Facility team.

91.    Nexii's presence at the Hazleton Facility is crucial to the Hazleton Operator's ability to fulfill its customer contracts as Nexii employees provide needed guidance and support.

92.    Customers, including major national and international companies, such as JPMorgan Chase Bank, N.A. ("Chase"), rely on Nexii's involvement in operations at the Hazleton Facility in agreeing to have work performed for them by the Hazleton Operator.

93.    If Defendants persist in keeping Nexii out of the Hazleton Facility, the Hazleton Operator will be unable to fulfill its outstanding customer contracts or sign new contracts, thereby damaging itself and the Nexii brand.

94.    The Step-In Rights were specifically negotiated and included in the Manufacturing Agreement to ensure that Nexii could swiftly step-in to assist,

manage, and supervise operations at the Hazleton Facility notwithstanding any financial or performance difficulties experienced by the Hazleton Operator.

95.     By shutting Nexii out of the Hazleton Facility, Defendants are risking the viability of the business as a whole, and Nexii's reputation in the marketplace.

96.     On information and belief, on or about November 30, 2022, Wolfington convened a meeting of employees at the Hazleton Facility (the "Employee Meeting") at which he announced that Defendants intended to start a new, competing panel technology company and their first investor meeting was scheduled for Friday, December 2, 2022.

97.     On further information and belief, during the Employee Meeting, Wolfington announced a new engineer had started at the Hazleton Facility to drive implementation of the competing system.

98.     Based on the foregoing, the Hazleton Operator, by and through the WM Defendants, has breached the confidentiality and non-competition provisions contained in Articles 10 and 15 of the Manufacturing Agreement, and has thus committed further remediation defaults under the Manufacturing Agreement.

99.     Alternatively, the Hazleton Operator, by and through the WM Defendants, has engaged in an anticipatory breach of the confidentiality and non-competition provisions contained in Articles 10 and 15 of the Manufacturing Agreement, and must be enjoined from actually breaching those provisions.

100.   The WM Defendants intentionally and improperly interfered with the Hazleton Operator's ability to fulfill its obligations under the confidentiality and non-competition provisions of the Manufacturing Agreement, causing the Hazleton Operator to breach those provisions, resulting in pecuniary losses and risking irreparable harm to Nexii.

IV.   **Wolfington and Metzler Engage in Reckless Behavior, Put Customer Relationships at Risk, and Defame and Harass Nexii.**

The WM Defendants Mismanage the Hazleton Operator's Finances

101.   On information and belief, as the Hazleton Facility's individual managers, Wolfington and Metzler direct and authorize the Hazleton Operator's finances, including payment of its various financial obligations.

102.   From and after executing the Manufacturing Agreement, the Hazleton Operator experienced financial difficulties and was unable to service its financial obligations to Nexii pursuant to the Manufacturing Agreement and certain of its other financial obligations to third parties.

103.   Beginning as early as December 2021, the Hazleton Operator repeatedly advised Nexii that it had insufficient funds on hand to pay vendors and/or to make payroll.

104.   To prevent an interruption in operations at the Hazleton Facility, following the March 8, 2022 transactions described herein, Nexii agreed to transfer needed operational funds to the Hazleton Operator. Such transfers included, advance

24

payment in satisfaction of certain note obligations owed from Nexii to the Hazleton Operator, payments in exchange for title to certain equipment, and payment in exchange for certain research and development undertaken by the Hazleton Operator with respect to the Nexii System.

105.   Notwithstanding these efforts, the Hazleton Operator's financial difficulties persist. Indeed, several Nexii employees have been contacted by the Hazleton Operator's vendors and suppliers complaining about unpaid bills and invoices. Certain of these vendors and suppliers have demanded payment from Nexii.

106.   Despite the Hazleton Operator's apparent inability to service certain third-party and payroll obligations, on information and belief, the WM Defendants have never allowed the Hazleton Operator to miss payment of Wolfington's and Metzler's salaries which, on information and belief, total at least $360,000 per year for each of them.

107.   Upon exercising its Step-In Rights, Nexii intends to work with the Hazleton Operator's vendors and suppliers to ensure their willingness to do business with the Hazleton Operator going forward.

108.   For Nexii to understand and effectively manage the relationship with the Hazleton Operator's suppliers and vendors and other costs associated with

running the Hazleton Facility, Nexii must be granted "unfettered access" to the Hazleton Facility as provided in the Manufacturing Agreement.

The Defendants' Actions Are Putting Key Customer Relationships in Jeopardy

109.   The Defendants' actions are putting numerous key customer relationships in jeopardy, certain examples of which are detailed below.

110.   The Hazleton Operator is currently executing a project to assemble a building for Chase (the "Chase Project") which requires completion by January 6, 2023.

111.   Notwithstanding shutting Nexii out of the Hazleton Plant and issuing the Purported Notice of Default, on or about December 12, 2022, the Hazleton Operator requested that Nexii purchase approximately $80,000 worth of materials necessary for the Chase Project that the Hazleton Operator is unable to acquire due to non-payment to the relevant vendors and suppliers.

112.   Chase has indicated that, subject to the Hazleton Operator's timely and quality performance on the Chase Project, Chase intends to award additional future projects to the Hazleton Operator. Accordingly, timely completion of the Chase Project is critical for both Nexii's and the Hazleton Operator's business.

113.   If the Hazleton Operator's interference with Nexii's Step-In Rights persists, Nexii will be unable to ensure that the Chase Project is completed on time

and to Chase's satisfaction, thereby threatening the Hazleton Operator's and Nexii's future relationship with Chase.

114.   Moreover, as noted above, upon exercising its Step-In Rights, Nexii can take steps to ensure the Chase Project is not delayed due to the Hazleton Operator's lack of payment to vendors and suppliers.

115.   In October 2022, the Hazleton Operator completed the first phase of a major, ten-building project for the New York State Thruways Authority ("NYSTA"), pursuant to a contract managed by AECOM, one of North America's leading construction management firms.

116.   On information and belief, the next phase of the NYSTA project is for fifteen buildings and is estimated to be worth approximately $15,000,000.

117. AECOM has expressed concerns to Nexii about the Hazleton Operator's management capability and does not believe the Hazleton Operator will be able to obtain the bond required for the next phase of the NYSTA project. As a result, AECOM has indicated that it will only move forward if Nexii is the party with whom it contracts rather than the Hazleton Operator.

118.   Upon exercising its Step-In Rights, Nexii will have the ability to execute a contract with AECOM because Nexii will be in a position to supervise and manage fulfillment of such contract by the Hazleton Operator. Nexii cannot execute such contract without knowing it has the right to supervise and manage the project.

119.   If Nexii is denied its Step-In Rights, it is imminent that both Chase and AECOM will walk away and decline to give either Nexii or the Hazleton Operator any further business, resulting in financial losses and irreparable damage to Nexii's reputation and goodwill in the industry.

<u>Wolfington's Erratic Behavior and Legal Troubles</u>

120.   In the past several months, Wolfington has exhibited increasingly unstable and unprofessional behavior.

121.   For example, Wolfington has repeatedly sent angry, erratic, and at times incomprehensible text messages to various Nexii employees, including, but not limited to, Nexii's chief executive office, Stephen Sidwell ("<u>Sidwell</u>") and Carter.

122.   On or about November 24, 2022, Carter sent a text message to Wolfington wishing him a happy Thanksgiving and requesting a call.

123.   In the morning of November 25, 2022, Carter had a telephone call with Wolfington during which Wolfington's speech was slurred and he immediately began yelling, swearing, and threatening legal action against Nexii.

124.   Upon ending the call, Wolfington sent Carter a barrage of text messages stating that he was "done" with Nexii and lodging a series of expletive laden-threats.

125.   Additionally, on or around the same date, Wolfington called William F. McNabb, III ("<u>McNabb</u>"), co-chair of Nexii's board, and spewed another expletive-laden attack on Nexii.

126.   Shortly thereafter, on November 28, 2022, Wolfington messaged Sidwell and asked for forgiveness.

127.   Wolfington's conduct over the Thanksgiving holiday is consistent with past similar alarming and inappropriate texts from Wolfington to various Nexii employees that are often followed by a remorseful message sent to Sidwell.

128.   Wolfington's messages have become more frequent and troubling and, at times, appear to have been sent while under the influence of alcohol and/or other intoxicating substances.

129.   Due to the growing concern about Wolfington's behavior, Nexii conducted a limited public records search on Wolfington.

130.   That search revealed that Wolfington had plead guilty to numerous charges of driving under the influence and public drunkenness, including as recently as May 3, 2022.

131.   The search further revealed that on or about June 23, 2022, Wolfington was charged with, among other things, furnishing liquor to and corrupting a minor, which offense allegedly took place on February 12, 2022.

<u>Defendants Defame and Harass Nexii and its Employees</u>

132.   On December 8, 2022, Sidwell received a message from Wolfington in a group text with Metzler, threatening to "expose" Nexii to investors and various prominent newspapers, including the New York Times, Washington Post, and Los

29

Angeles Times, by falsely alleging that "Nexite [sic] is a lie" and disparaging Nexii's operations and financial condition.

133.   Sidwell recently learned that Wolfington communicated the same false allegations to Feldman.

134.   Wolfington's statements to Sidwell and Feldman about Nexii are patently false and have no basis in fact or reality; and Wolfington willfully made such statements knowing they were untrue.

135.   On December 9, 2022, Metzler called Nexii's vice president of margin improvement, Naomi Marshall ("Marshall"), claiming to have had three telephone calls from different news reporters asking him to speak on a story regarding alleged issues with Nexii products.

136.   Nexii has not received any telephone calls from reporters or news agencies requesting comment on any story or investigation regarding the quality of Nexii products. On information and belief, Metzler's comments to Marshall were untrue and intended solely to harass, annoy, and alarm Marshall and Nexii.

137.   Indeed, all completed projects built utilizing the Nexii System have proven to be successful.

138.   The WM Defendants, individually and on behalf of the Hazleton Operator,  knowingly and willfully defamed Nexii by making false statements about Nexii to third parties, including Feldman.

139.   Defendants' false statements about Nexii have harmed its reputation.

140.   The WM Defendants, individually and on behalf of the Hazleton Operator, have threatened to publicize additional false statements about Nexii to the media in order to harass, annoy, and alarm Nexii and its employees.

141.   The WM Defendants, individually and on behalf of the Hazleton Operator, have sent Nexii and its employees numerous abusive and expletive-laden text messages intended to harass, annoy, and alarm the recipients, and with the knowledge that it would likely cause such annoyance and alarm.

## COUNT I

## (Against Hazleton Operator)

## Breach of Manufacturing Agreement – Security Agreement Default

142.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

143.   Each of the Nexii Agreements, including the Manufacturing Agreement, are valid and enforceable contracts between Nexii and the Hazleton Operator.

144.   By failing to make any of the payments due and owing under the Promissory Note and Master Lease Agreement, the Hazleton Operator is in default under each agreement and such defaults further constitute a default under the Security Agreement.

31

145.   The Hazleton Operator's default under the Security Agreement constitutes a remediation default under the Manufacturing Agreement, Section 17.3(q).

146.   Under Section 17.5(c) of the Manufacturing Agreement, upon the occurrence and during the continuance of any remediation default, Nexii is authorized to immediately and without notice exercise its Step-In Rights, which include, among other things, to "[s]tep-in, manage, supervise and assist" the Hazleton Operator in its manufacture and delivery services.

147.   During Nexii's exercise of its Step-In Rights, the Hazleton Operator is required to grant Nexii "unfettered access and use" of the Hazleton Facility and the "casting beds, workforce, proprietary information … equipment, materials, parts and other supplies and resources" located at the Hazleton Facility.

148.   Because of the Hazleton Operator's remediation defaults under the Manufacturing Agreement, and in light of the circumstances detailed in Sections III and IV above, on December 14, 2022, Nexii advised Defendants that it intended to immediately exercise its Step-In Rights.

149.   The Hazleton Operator, by and through the WM Defendants, did not agree to grant Nexii immediate access to the Hazleton Facility thereby preventing Nexii from exercising its Step-In Rights.

150.   The Hazleton Operator has further breached the Manufacturing Agreement by refusing to grant Nexii access to the Hazleton Facility and otherwise failing to cooperate with Nexii in the exercise of its Step-In Rights.

151.   Section 22.2 of the Manufacturing Agreement includes a limitation on damages barring Nexii and the Hazleton Operator from recovering consequential damages, including damages on account of lost profits or opportunities or business interruption.

152.   The Hazleton Operator's ongoing interference with Nexii's Step-In Rights, if continued, will cause Nexii to suffer irreparable harm including, but not limited to, lost profits and business opportunities for which Nexii will be unable to recover damages pursuant to Section 22.2 of the Manufacturing Agreement.

153.   Nexii is entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the Hazleton Operator and any person acting on its behalf, including the WM Defendants, from interfering with Nexii's exercise of its Step-In Rights and compelling the Hazleton Operator to cooperate with Nexii in the exercise of its Step-In Rights.

154.   Nexii is further entitled to an order of specific performance compelling the Hazleton Operator to cooperate with Nexii in the exercise of its Step-In Rights by, among other things, granting Nexii unfettered access to the Hazleton Facility.

155.   Pursuant to Section 22.1 of the Manufacturing Agreement, a party who succeeds in securing an injunction or order of specific performance is entitled to payment from the other party of all attorneys' fees, costs, and expenses incurred by the party attempting to enforce the Manufacturing Agreement.

156.   Accordingly, upon securing an injunction and/or order of specific performance against the Hazleton Operator as requested herein, Nexii is entitled to an award of its attorneys' fees, costs, and expenses.

157.   Additionally, because this is an action on a contract, Nexii is also entitled to an award of its reasonable attorney's fees and costs pursuant to 6 *Del. C.* § 4344.

## COUNT II

## (Against WM Defendants)

## Tortious Interference With Contracts

158.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

159.   Each of the Nexii Agreements is a valid and enforceable contract between Nexii and the Hazleton Operator.

160.   Wolfington executed each of the Nexii Agreements on behalf of the Hazleton Operator. Accordingly, Wolfington knew about the Nexii Agreements.

34

161.   The Wolfington Manager is a member and former manager of the Hazleton Operator. Moreover, Wolfington and Metzler individually manage, control, and indirectly own the Wolfington Manager. Accordingly, each of the WM Defendants knew about the Nexii Agreements.

162.   On information and belief, given their role managing the day-to-day operations of the Hazleton Operator, on information and belief, the WM Defendants managed the Hazleton Operator's finances and decided which of the Hazleton Operator's financial obligations to pay.

163.   The WM Defendants intentionally interfered with the Hazleton Operator's performance under each of the Nexii Agreements by preventing the Hazleton Operator from making any of the payments owed under the Promissory Note and Master Lease Agreement.

164.   The actions taken by the WM Defendants to prevent the Hazleton Operator from fulfilling its payment obligations under the Promissory Note and Master Lease Agreement were unjustified and significant factors causing the Hazleton Operator to breach each of the Nexii Agreements.

165.   The WM Defendants further intentionally interfered with the Hazleton Operator's performance under the Manufacturing Agreement by denying Nexii access to the Hazleton Facility following Nexii's invocation of its Step-In Rights and refusing to cooperate with Nexii in the exercise of such Step-In Rights.

166.   The actions taken by the WM Defendants following Nexii's invocation of its Step-In Rights were unjustified and significant factors that caused the Hazleton Operator to breach the Manufacturing Agreement.

167.   Nexii has been damaged as a direct and proximate result of the WM Defendants interference with the Nexii Agreements, and the WM Defendants are liable for such damages in an amount to be proven at trial.

168.   Nexii is further entitled to injunctive relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the WM Defendants from interfering with Nexii's exercise of its Step-In Rights and compelling the WM Defendants to cooperate with Nexii as necessary in the exercise of such Step-In Rights.

169.   Because this is an action on a contract, Nexii is entitled to an award of its reasonable attorney's fees and costs pursuant to 6 *Del. C.* § 4344.

## COUNT III

### (Against Hazleton Operator)

### Breach of Manufacturing Agreement – Confidentiality and Non-Compete Provisions

170.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

36

171.   The Manufacturing Agreement is a valid and enforceable contract between Nexii and the Hazleton Operator.

172.   Pursuant to Article 10 of the Manufacturing Agreement, the Hazleton Operator is required to protect the Confidential Information by, among other things, (a) not disclosing the Confidential Information without Nexii's consent; (b) not using, copying or exploiting the Confidential Information except for the sole purpose of operating the business pursuant to the terms of the Manufacturing Agreement; (c) not reverse engineering or analyzing samples for chemical compositions of any part of the Confidential Information; and (d) taking all reasonable steps to ensure that employees, contractors, and authorized third parties comply with the Manufacturing Agreement's confidentiality provisions. *See* Manufacturing Agreement § 10.3.

173.   Pursuant to Article 15 of the Manufacturing Agreement, the Hazleton Operator is prohibited from diverting or attempting to divert any business or customer of Nexii or the Hazleton Operator to any of Nexii's competitors. *See id.* § 15.1(a).

174.   Article 15 further prohibits the Hazleton Operator from performing any act that may injure or prejudice the goodwill associated with Nexii's trademarks or the Nexii System. *Id.*

175.   Article 15 further broadly prohibits the Hazleton Operator from engaging with or having any interest whatsoever in any business that competes with

Nexii or is engaged in the sale of modular building components or the sale of products and services ancillary thereto. *Id.*

176.   Section 8.5 further prohibits use of the Hazleton Facility for any purpose other than operation as Nexii manufacturing facility.

177.   On information and belief, the Hazleton Operator has breached the Manufacturing Agreement by disclosing certain of the Confidential Information to unauthorized third parties for the purpose of creating a new company intended to compete with Nexii.

178.   The Hazleton Operator's unauthorized disclosure of Nexii's Confidential Information and efforts to create a new business intended to compete with Nexii has caused or will cause Nexii to suffer irreparable harm. Such irreparable harm includes, among other injuries, lost profits, lost business opportunities, lost market share, and diminution in the value of Nexii's stock for which Nexii will be unable to recover damages pursuant to Section 22.2 of the Manufacturing Agreement.

179.   Nexii is entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the Hazleton Operator from further unauthorized disclosure or use of the Confidential Information in violation of the Manufacturing Agreement; and compelling the Hazleton Operator

to take all reasonable and necessary steps to prevent further unauthorized disclosure or use of the Confidential Information by third-parties.

180.   Nexii is entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the Hazleton Operator from engaging in any business intended or likely to compete with Nexii.

181.   Nexii is further entitled to an order of specific performance compelling the Hazleton Operator's strict compliance with Articles 10 and 15 of the Manufacturing Agreement.

182.   The Hazleton Operator's unauthorized disclosure of the Confidential Information and efforts to compete with Nexii are remediation defaults under the Manufacturing Agreement, Sections 17.3(e) and (f). Accordingly, Nexii is entitled to exercise its Step-In Rights.

183.   The Hazleton Operator's ongoing interference with Nexii's Step-In Rights as described herein, if continued, will cause Nexii to suffer irreparable harm including, but not limited to, lost profits and business opportunities for which Nexii will be unable to recover damages pursuant to Section 22.2 of the Manufacturing Agreement.

184.   Nexii is entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the Hazleton Operator and any person acting on its behalf, including the WM Defendants, from interfering

with Nexii's exercise of its Step-In Rights and compelling the Hazleton Operator to cooperate with Nexii in the exercise of its Step-In Rights.

185.   Nexii is further entitled to an order of specific performance compelling the Hazleton Operator to cooperate with Nexii in the exercise of its Step-In Rights by, among other things, granting Nexii unfettered access to the Hazleton Facility.

186.   Pursuant to Section 22.1 of the Manufacturing Agreement, a party who succeeds in securing an injunction or order of specific performance is entitled to payment from the other party of all attorneys' fees, costs, and expenses incurred by the party attempting to enforce the Manufacturing Agreement.

187.   Accordingly, upon securing an injunction and/or order of specific performance against the Hazleton Operator as requested herein, Nexii is entitled to an award of its attorneys' fees, costs, and expenses.

188.   Additionally, because this is an action on a contract, Nexii is also entitled to an award of its reasonable attorney's fees and costs pursuant to 6 *Del. C.* § 4344.

## COUNT IV

### (Against Hazleton Operator)

### In the Alternative, Anticipatory Breach of Manufacturing Agreement

189.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

40

190.   The Manufacturing Agreement is a valid and enforceable contract between Nexii and the Hazleton Operator.

191.   Pursuant to Article 10 of the Manufacturing Agreement, the Hazleton Operator is required to protect the Confidential Information by, among other things, (a) not disclosing the Confidential Information without Nexii's consent; (b) not using, copying or exploiting the Confidential Information except for the sole purpose of operating the business pursuant to the terms of the Manufacturing Agreement; (c) not reverse engineering or analyzing samples for chemical compositions of any part of the Confidential Information; and (d) taking all reasonable steps to ensure that employees, contractors, and authorized third parties comply with the Manufacturing Agreement's confidentiality provisions. *See* Manufacturing Agreement § 10.3.

192.   Pursuant to Article 15 of the Manufacturing Agreement, the Hazleton Operator is prohibited from diverting or attempting to divert any business or customer of Nexii or the Hazleton Operator to any of Nexii's competitors. *See id.* § 15.1(a).

193.   Article 15 further prohibits the Hazleton Operator from performing any act that may injure or prejudice the goodwill associated with Nexii's trademarks or the Nexii System. *Id.*

194.   Article 15 further broadly prohibits the Hazleton Operator from engaging with or having any interest whatsoever in any business that competes with

Nexii or is engaged in the sale of modular building components or the sale of products and services ancillary thereto. *Id.*

195.   Section 8.5 further prohibits use of the Hazleton Facility for any purpose other than operation as Nexii manufacturing facility.

196.   On information and belief, the Hazleton Operator, by and through the WM Defendants, has committed an anticipatory breach of the Manufacturing Agreement by disclosing to Feldman the WM Defendants' intention to disclose certain of the Confidential Information to unauthorized third parties for the purpose of creating a new company intended to compete with Nexii.

197.   The Hazleton Operator's anticipated unauthorized disclosure of Nexii's Confidential Information and anticipated efforts to create a new business intended to compete with Nexii will cause Nexii to suffer irreparable harm. Such irreparable harm includes, among other injuries, lost profits, lost business opportunities, lost market share, and diminution in the value of Nexii's stock for which Nexii will be unable to recover damages pursuant to Section 22.2 of the Manufacturing Agreement.

198.   Nexii is entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the Hazleton Operator from disclosing or using the Confidential Information in violation of the Manufacturing Agreement.

199.   Nexii is entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the Hazleton Operator from engaging in any business intended or likely to compete with Nexii.

200.   Nexii is further entitled to an order of specific performance compelling the Hazleton Operator's strict compliance with Articles 10 and 15 of the Manufacturing Agreement.

201.   Pursuant to Section 22.1 of the Manufacturing Agreement, a party who succeeds in securing an injunction or order of specific performance is entitled to payment from the other party of all attorneys' fees, costs, and expenses incurred by the party attempting to enforce the Manufacturing Agreement.

202.   Accordingly, upon securing an injunction and/or order of specific performance against the Hazleton Operator as requested herein, Nexii is entitled to an award of its attorneys' fees, costs, and expenses.

203.   Additionally, because this is an action on a contract, Nexii is also entitled to an award of its reasonable attorney's fees and costs pursuant to 6 *Del. C.* § 4344.

## COUNT V

### (Against WM Defendants)

### Tortious Interference with Manufacturing Agreement

204.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

205.   The Manufacturing Agreement is a valid and enforceable contract between Nexii and the Hazleton Operator.

206.   Wolfington executed the Manufacturing Agreement on behalf of the Hazleton Operator. Accordingly, Wolfington knew about the Manufacturing Agreement.

207.   The Wolfington Manager is a member and former manager of the Hazleton Operator. Moreover, Wolfington and Metzler individually manage, control, and indirectly own the Wolfington Manager. Accordingly, each of the WM Defendants knew about the Manufacturing Agreement.

208.   On information and belief, the WM Defendants intentionally interfered with the Hazleton Operator's performance under the Manufacturing Agreement by disclosing the Confidential Information to unauthorized third parties for the purpose of creating a new company intended to compete with Nexii.

209.   The WM Defendants unauthorized disclosure of the Confidential Information and efforts to start a business intended to compete with Nexii were

unjustified and significant factors causing the Hazleton Operator to breach the Manufacturing Agreement.

210.   The WM Defendants further intentionally interfered with the Hazleton Operator's performance under the Manufacturing Agreement by denying Nexii access to the Hazleton Facility following Nexii's invocation of its Step-In Rights and refusing to cooperate with Nexii in the exercise of such Step-In Rights.

211.   The actions taken by the WM Defendants following Nexii's invocation of its Step-In Rights were unjustified and significant factors that caused the Hazleton Operator to breach the Manufacturing Agreement.

212.   Nexii has been damaged as a direct and proximate result of the WM Defendants tortious interference with the Manufacturing Agreement and the WM Defendants are liable for such damages in an amount to be proven at trial.

213.   Nexii is further entitled to injunctive relief, including a temporary restraining order and preliminary and permanent injunctions prohibiting the WM Defendants from interfering with Nexii's exercise of its Step-In Rights and compelling the WM Defendants to cooperate with Nexii as necessary in the exercise of such Step-In Rights.

214.   Because this is an action on a contract, Nexii is entitled to an award of its reasonable attorney's fees and costs pursuant to 6 *Del. C.* § 4344.

## COUNT VI

### (Against All Defendants)

### Defamation

215.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

216.   The Defendants, on at least one occasion, published statements to Feldman falsely claiming that Nexii's products do not work and that Nexii was out of money.

217.   Wolfington and Metzler, individually and acting on behalf of the Wolfington Manager and Hazleton Operator, threatened to, and may have, spoken with several prominent newspapers and asserted various false allegations about Nexii, its products, operations, and financial condition.

218.   The Defendants' statements to Feldman and the press malign Nexii's trade, business, and profession and therefore constitute defamation per se.

219.   The Defendants are liable to Nexii for special damages in an amount to be proven at trial.

## COUNT VII

### (All Defendants)

### Harassment

220.   Nexii incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

221.   Wolfington, individually and acting on behalf of the Wolfington Manager and Hazleton Operator, has sent numerous expletive laden text messages to Nexii's officers and employees, including Sidwell and Carter.

222.   Additionally, on December 8, 2022, Wolfington, individually and acting on behalf of the Wolfington Manager and Hazleton Operator, sent text messages to Sidwell in a group thread with Metzler threatening to "expose" Nexii to investors and prominent newspapers with false allegations about Nexii, its products, operations, and financial condition.

223.   Wolfington's expletive laden text messages to Nexii's officers and employees, and his December 8, 2022 text message to Sidwell constitute alarming and distressing conduct by Defendants.

224.   On information and belief, Wolfington sent the text messages described herein solely with the intent to harass, annoy, and alarm Nexii; and Wolfington knew that such communications were likely to cause Nexii annoyance and alarm.

225.   On December 9, 2022, Metzler, individually and acting on behalf of the Wolfington Manager and Hazleton Operator, called Marshall and at least one other Nexii employee claiming to have been contacted by multiple news reporters asking him to speak on a story involving issues with Nexii products.

226.   Nexii has not received any telephone call from reporters or news agencies requesting comment on any story or investigation regarding the quality of Nexii's products.

227.   On information and belief, Metzler's comments to Marshall and others on December 9, 2022 were untrue and therefore, constitute alarming or distressing conduct by Defendants.

228.   On information and belief, Metzler's comments to Marshall were intended solely to harass, annoy, and alarm Nexii and Metzler knew such comments were likely to cause Nexii annoyance or alarm.

229.   Wolfington and Metzler committed the harassing conduct described herein individually and in their capacities as members, managers, and agents on behalf of the Wolfington Manager and the Hazleton Operator. Therefore, Defendants are liable to Nexii in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Nexii prays for an Order:

(a)     granting judgment against Defendants;

(b)     finding that the Hazleton Operator has breached the Manufacturing Agreement and Nexii is entitled to exercise its Step-In Rights as set forth in the Manufacturing Agreement;

(c)     requiring Defendants to cooperate and permit Nexii to fully exercise its Step-In Rights;

(d)     finding that the WM Defendants have tortiously interfered with the Hazleton Operator's contractual obligations to Nexii and awarding damages for losses resulting from such interference;

(e)     finding that the Defendants have defamed and harassed Nexii and awarding Nexii damages for losses resulting from such defamation and harassment;

(f)     enjoining the Defendants from defaming and harassing Nexii;

(g)     granting extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, so as to assure that Nexii has an effective remedy;

49

(h)     awarding to Nexii the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and

expenses; and

(i)     granting such other and further relief as the Court deems just and

proper.

Dated:  December 15, 2022                DORSEY & WHITNEY (DELAWARE) LLP


_/s/ Eric Lopez Schnabel_
Eric Lopez Schnabel (DE Bar No. 3672)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801
(302) 425-7171

**_Attorneys for Nexii Building Solutions Inc._**

OF COUNSEL:

DORSEY & WHITNEY LLP
Daniel Goldberger
(to be admitted _pro hac vice_)
Rachel P. Stoian
(to be admitted _pro hac vice_)
51 West 52nd Street
New York, NY 10019